IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


THE ALASKA HOTEL RESTAURANT        )
AND CAMP EMPLOYEES HEALTH AND      )
WELFARE TRUST FUND,                )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )
                                   )
REMINGTON LODGING & HOSPITALITY,   )
d/b/a THE SHERATON ANCHORAGE,      )
                                   )     No. 3:13-cv-0007-HRH
                    Defendant.     )
_____)


<u>O R D E R</u>

<u>Cross-motions for Summary Judgment</u>

Plaintiff moves for partial summary judgment.[1]  This motion is opposed[2] and

defendant cross-moves for summary judgment.[3]  Defendant's cross-motion is opposed.[4]

Oral argument was requested and has been heard.

_____

[1]Docket No. 36.

[2]Docket No. 41.

[3]Docket No. 39.

[4]Docket No. 40.

-1-

<u>Facts</u>

Plaintiff is The Alaska Hotel Restaurant and Camp Employees Health and Welfare Trust Fund. Defendant is Remington Lodging & Hospitality d/b/a The Sheraton Anchorage.

Plaintiff is a multi-employer health and welfare trust fund maintained pursuant to the Taft-Hartley Act. Defendant operates the Sheraton Anchorage hotel, which is a signatory and successor to a series of collective bargaining agreements (CBAs) with the Hotel Employees, Restaurant Employees Union Local 878 ("the Union").

The CBA at issue in this case was signed on March 18, 2005.[5] The CBA required defendant to make monthly contributions to plaintiff which were used to finance a health benefits plan provided to union members. The contribution rates set out in the CBA escalated over the life of the CBA from $1.95 per hour for each compensable hour worked by employees covered by the plan to $2.55 per hour worked.[6] The CBA provides that

> [t]he rules pertaining to contributions and benefits, and in the administration of the Health Fund are provided for in a Trust Agreement and by the Board of Trustees. The parties to the Trust Agreement have the authority to amend the same and the Board of Trustees can make such changes and exercise such authority as the Trust Agreement permits.[7]

_____

[5]Agreement at 44, Exhibit A, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[6]<u>Id.</u> at 36-37.

[7]<u>Id.</u> at 37.

The CBA provided that the agreement

> shall be in full force and effect from March 1, 2005, and continue until February 28, 2009, and thereafter from year to year unless either party elects to terminate or proposes changes in terms of the Agreement. Such notice of election to terminate or propose changes in the terms of the Agreement shall be given in writing not less than sixty (60) days before the 31st of January of 2009 or subsequent year when such changes are to go into effect. After receipt of such notice, the parties must commence negotiations forty-five (45) days prior to January 31 of 2009 or subsequent year such changes are to go into effect.[8]

The Trust Agreement referred to in the CBA provides that

> collective bargaining agreements, or supplements thereto, require Employer contributions of certain sums per Employee to a Trust Fund to be created and established by this Trust Agreement, which Fund is to be used for the purpose of providing and maintaining health and welfare services and related benefits for participants employed by such Employer and for members of the families of such participants or any such benefits as the Trustees of such Fund may determine[.9]

Per the terms of the Trust Agreement, contributions to the Trust Fund are due by the 15th of each month and "[e]ach monthly contribution shall be accompanied by a simple report in a form prescribed by the Trustees."[10] "Contributions" are defined as "the payments

---

[8]Id. at 43.

[9]Second Amended Agreement and Declaration of Trust [etc.], Exhibit C at 5, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[10]Id. at 12.

required of an employer ... by the terms of a collective bargaining agreement...."[11] The Trust

Agreement provides that

> [t]he liability of an employer with respect to the Fund or Plan shall be limited to the payments required by the collective bargaining agreement with respect to his or its individual or joint venture operations and the requirements of ERISA or any other applicable law. The employer shall not be required to make any further payments or contributions to the cost of operating the Fund or Plan except as required by ERISA or any other applicable law.[12]

The Trust Agreement further provides that

> this Agreement shall continue in existence until such time as it is terminated by one of the following means:
>
> (a)    by action of the signatory parties; or
>
> (b)    by termination by the parties to this Agreement by an instrument in writing executed by mutual consent at any time, subject, however, to all regulations and procedures for plan termination provided by ERISA and such applicable laws and regulations.[13]

Prior to the expiration of the CBA on February 28, 2009, defendant and the Union

began negotiations for a new CBA. During those negotiations, defendant proposed

---

[11]Id. at 8.

[12]Id. at 10-11.

[13]Id. at 24.

replacing the health and welfare plan provided by plaintiff with a company-sponsored health plan.

The CBA was extended until August 31, 2009. There were no further extensions after August 31, 2009.

In October 2009, Arch Stokes, defendant's negotiator, advised Rick Sawyer, the Union negotiator, that it was defendant's position that the parties were at an impasse.[14] Having declared an impasse, defendant proceeded to unilaterally implement some of the provisions of its last contract proposal,[15] but defendant did not implement its proposal to replace the health and welfare plan provided by plaintiff with a company-sponsored plan. Defendant continued to submit monthly reports and make contributions to plaintiff at the contribution rate established in the CBA, which was then $2.55 per employee-hour worked.

Despite defendant having declared an impasse, negotiations for a new CBA continued. Defendant and the Union had meetings in December of 2009 and March of 2010. But, following the March 2010 meeting, defendant declared another impasse and advised the Union that it intended to implement its proposal to replace the current health and

---

[14]NLRB ALJ Decision, Exhibit E at 29, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[15]Id.

welfare plan with a company-sponsored plan.[16]  On May 1, 2010, defendant implemented

a company-sponsored plan (the Aetna plan) and stopped making contributions to plaintiff.

Sometime thereafter, the Union filed unfair labor practice charges against defendant,

asserting, among other things, that the declaration of an impasse was premature and thus

the implementation of the Aetna plan was unlawful.  On August 25, 2011, the ALJ in the

NLRB proceedings issued an interim, recommended decision.[17]  The ALJ determined that

defendant's unilateral implementation of the Aetna plan was improper, in large part because

the ALJ found that although defendant and the Union had legitimately been at an impasse

earlier in the negotiations, that impasse had been broken in March 2010.

On February 2, 2012, defendant was ordered to reinstate the health and welfare plan

provided by plaintiff if the Union so requested.  <u>Ahearn v. Remington Lodging and</u>

<u>Hospitality</u>, 842 F. Supp. 2d 1186, 1207 (D. Alaska 2012).  The Union made such a request

and the plan was restored, effective March 1, 2012.  Defendant was not ordered, at that time,

---

[16]<u>Id.</u> at 41 & 43.

[17]On April 24, 2013, the NLRB adopted the ALJ's recommended remedy that
defendant "[o]n request by the Union, rescind the changes in the terms and conditions of
employment for its unit employees that were unilaterally implemented ... on May 1, 2010,
regarding the unit employees' health insurance plan."  359 NLRB No. 95, 2013 WL 1771714,
at *8.  However, on June 27, 2014, the Board set aside its April 24, 2013 decision and order
in light of the Supreme Court's decision in <u>NLRB v. Noel Canning, a Division of the Noel
Corp.</u>, --- U.S. —, 134 S. Ct. 2205 (2014).  Order, 2014 WL 2929788.

to make retroactive contributions to plaintiff for the time period that the Aetna plan was in effect, probably because there had been no lapse in employee health coverage.

However, on January 11, 2013, plaintiff commenced this action pursuant to Section 515 of ERISA seeking to recover unpaid employee health benefit contributions for the period of April 2010[18] through February 2012. Plaintiff now moves for partial summary judgment, arguing that defendant was contractually obligated under the CBA and/or Trust Agreement to make contributions during the period in question. Defendant cross-moves for summary judgment, arguing that it had no contractual obligation to make contributions during the period in question.[19]

Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to show that there is an absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there

---

[18]Defendant contends that it paid contributions in April 2010.

[19]As defendant repeatedly points out, this court only has jurisdiction to determine whether an employer has a contractual obligation to make contributions. Any question as to whether an employer has a postcontractual obligation to make contributions is a matter for the NLRB. See Laborers Health & Welfare Trust for N. Calif. v. Advanced Lightweight Concrete Co., 484 U.S. 539, 547 (1988).

is a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor. <u>Id.</u> at 255. "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987). "Where the parties file cross-motions for summary judgment, the court must consider each party's evidence, regardless under which motion the evidence is offered." <u>Las Vegas Sands, LLC v. Nehme</u>, 632 F.3d 526, 532 (9th Cir. 2011).

Section 515 of ERISA provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. Thus, to prevail on its Section 515 claim, plaintiff must show that 1) it is a multiemployer trust, 2) that defendant was obligated under the terms of the plan or the CBA to make contributions for the time in question, and 3) that defendant failed to make the required contributions. <u>Trustees of Eighth Dist. Elec. Pension Fund v. Gietzen Elec., Inc.</u>, 898 F. Supp. 2d 1193, 1198 (D. Idaho 2012). It is undisputed that plaintiff is a multiemployer

trust and that defendant failed to make contributions after it implemented the Aetna plan. The sole issue in dispute here is whether defendant had any obligation to make contributions to plaintiff after it implemented the Aetna plan.

As an initial matter, there has been some suggestion by plaintiff that the Trust Agreement imposed an independent obligation upon defendant to make contributions. Plaintiff did not, however, make any express argument that the Trust Agreement, by itself, imposed an obligation upon defendant to make contributions, perhaps because, as defendant points out, there is no such language in the Trust Agreement. Nothing in the Trust Agreement imposes an independent obligation upon defendant to make contributions. Rather, the Trust Agreement expressly provides that it is the CBA that "require[s] Employer contributions of certain sums per hour per Employee to a Trust Fund...."[20] While, as plaintiff points out, the Trust Agreement has not expired, its mere existence does not impose any contractual obligations upon defendant to make contributions. Rather, the issue here is whether defendant had any obligation under the CBA to make contributions for the time in question.

Defendant argues that it had no obligation to make contributions for the time in question because it is undisputed that the CBA expired on August 31, 2009. Plaintiff, however, argues that it is disputed as to whether the CBA expired on August 31, 2009

---

[20]Second Amended Agreement and Declaration of Trust [etc.], Exhibit C at 5, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

because it is not clear whether defendant complied with the termination provision in the

CBA.  The CBA provided that the agreement

> shall be in full force and effect from March 1, 2005, and continue
> until February 28, 2009, and thereafter from year to year unless
> either party elects to terminate or proposes changes in terms of
> the Agreement.  Such notice of election to terminate or propose
> changes in the terms of the Agreement shall be given in writing
> not less than sixty (60) days before the 31st of January of 2009 or
> subsequent year when such changes are to go into effect.  After
> receipt of such notice, the parties must commence negotiations
> forty-five (45) days prior to January 31 of 2009 or subsequent
> year such changes are to go into effect.[21]

Plaintiff argues that defendant has failed to offer any admissible evidence that shows that

it complied with the termination provision.

In order to establish that the CBA had expired on August 31, 2009, defendant offered

letters between Stokes and Sawyer.[22]  In a September 17, 2009 letter, Stokes advised Sawyer

that it was defendant's position that "the collective bargaining agreement for the Sheraton

Anchorage is expired."[23]  In response, Sawyer acknowledged that the CBA had expired and

_____

[21]Agreement, Exhibit A at 45, Defendant's Motion and Memorandum for Summary
Judgment, Docket No. 39.

[22]Defendant also cited to NLRB testimony regarding these letters.

[23]Exhibit F at 2, Defendant's Motion and Memorandum for Summary Judgment,
Docket No. 39.

that the Union believed the CBA's terms were no longer in effect.[24]  Plaintiff argues that

because these letters were not authenticated, they cannot serve as evidence supporting

defendant's motion for summary judgment.  See Hal Roach Studios, Inc. v. Richard Feiner

& Co., 896 F. 2d 1542, 1551 (9th Cir. 1989) ("A document which lacks a proper foundation

to authenticate it cannot be used to support a motion for summary judgment.").  Although

defendant disputes that the letters were not previously authenticated, in its reply brief, it

provides the declaration of Arch Stokes, authenticating the letters.[25]  Thus, these letters are

evidence that defendant and the Union both believed that the CBA had expired on August

31, 2009.

In addition to the foregoing letters in which both defendant and the Union expressed

a belief that the CBA had expired on August 31, 2009, defendant offers evidence of its

compliance with the termination provision in the CBA.  Defendant offers an October 23, 2008

letter which Stokes sent to the Union, in which Stokes proposed coming to Anchorage on

October 27 and October 28 "for the purpose of collective bargaining...."[26]  Defendant

contends that this letter suffices as its written notice that it wanted to propose changes to the

---

[24]Id. at 3.

[25]Declaration of Arch Stokes at 3, ¶¶ 12-14, Exhibit 1, Remington's Reply in Support of its Motion for Summary Judgment, Docket No. 43.

[26]Exhibit A, Stokes Declaration, Exhibit 1, Remington's Reply in Support of its Motion for Summary Judgment, Docket No. 43.

CBA and that it was provided to the Union "not less than sixty (60) days before the 31st of January of 2009" as required by the termination provision in the CBA.[27] Defendant also cites to the ALJ's decision, in which he found that meetings between the Union and defendant on October 27 and 28, 2008, were bargaining sessions.[28] Thus, defendant argues that the ALJ's findings of fact established that negotiations "commence[d] [more than] ... forty-five (45) days prior to January 31 of 2009," as required by the CBA.[29]

Defendant also cites to portions of the ALJ's decision, in particular a statement by the ALJ that "[t]he last contract extension had expired on August 31."[30] Defendant argues that plaintiff is collaterally estopped from arguing that the CBA did not expire on August 31, 2009, in light of the ALJ's findings. Defendant contends that one of the factual issues in the NLRB proceedings was the "existence of a contractual relationship covered by ERISA" and thus the ALJ's findings as to this issue are entitled to preclusive effect.

---

[27]Agreement, Exhibit A at 45, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[28]Exhibit E at 16, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[29]Agreement, Exhibit A at 45, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[30]Exhibit E at 26, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

As plaintiff is quick to point out, the existence of a contractual relationship covered by ERISA was not an issue litigated in the NLRB proceedings. Moreover, the issue of whether defendant had complied with the termination provision in the CBA was not expressly litigated during the NLRB proceedings. Thus, plaintiff is not precluded from arguing that the CBA did not expire on August 31, 2009. However, all the evidence indicates that the CBA did expire on August 31, 2009 and that defendant complied with the termination provisions in the CBA. There is no evidence to the contrary. Because there are no genuine issues of material fact on this issue, a reasonable fact finder could only conclude that the CBA expired on August 31, 2009.

Plaintiff argues, however, that defendant cannot escape ERISA liability on the basis of a "termination" defense and cites to Carpenters Health and Welfare Trust Fund for California v. Bla-Delco Const., Inc., 8 F.3d 1365 (9th Cir. 1993), in support of this argument. There, several trust funds which were employee benefit funds sought to collect delinquent employee benefits contributions from Bla-Delco, an employer. Id. at 1366. Bla-Delco and the union's agreement provided that the agreement "shall remain in full force and effect until June 15, 1986, and shall continue from year to year thereafter unless either party shall give written notice to the other of the desire to change or cancel not more than ninety (90) days nor less than sixty (60) days prior to June 15, 1986 or June 15 of any succeeding year." Id. "On March 19, 1987, Bla–Delco sent a letter to the Union stating that it did not wish to

renew its agreement with the Union effective June 15, 1987." Id. "On April 7, 1987, the Union responded in writing that Bla–Delco's notice of cancellation was untimely and that 'the contract requires by its terms to remain in effect until June 15, 1989.'" Id. at 1366-67.

> On April 14, 1987, Bla–Delco requested in writing a copy of the contract that was in effect until June 15, 1989 and stated that its letter of March 19, 1987 served as Bla–Delco's notice of its desire to cancel the memorandum agreement with the Union. Neither the Union nor Bla–Delco filed a grievance or requested arbitration under the CBA regarding its disputed termination.

Id. at 1367. Bla-Delco stopped making contributions to the plaintiff trust funds after June 15, 1987 and argued that "it had terminated its obligations to make contributions to the Trust Funds because it had terminated the CBA with the Union...." Id. "The Trust Funds" argued "that Bla–Delco [was] precluded from raising contract termination as a defense to the Trust Funds' claim for contribution." Id. at 1369. The court observed that "[i]n an action to collect contributions, the Trust Funds stand in the position of third-party beneficiaries of the CBA. Generally, a third-party beneficiary's rights are subject to any contract defense that the promisor could assert against the promisee, if the promisee were suing on the contract." Id. "However, Congress and the courts have restricted the availability of contract defenses in trust fund collection actions because 'millions of workers depend upon the employee benefit trust funds for their retirement security.'" Id. (quoting Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 773 (9th Cir. 1986)). The court explained that "[i]n Rozay's Transfer, a trust fund collection action, [the court] discussed the distinction between the

permissible defense of 'fraud in the execution' and the impermissible defense of 'fraud in the inducement.'" Id. "Fraud in the execution is a permissible defense to a collection action because it results in the contract being void ab initio, while fraud in the inducement is an impermissible defense because it renders the contract merely voidable." Id. "In this case, Bla–Delco does not contend that the CBA never existed because of fraud or illegality. The CBA was a valid contract and Bla–Delco was bound by its terms to pay contributions to the Trust Funds. The dispute centers on whether Bla–Delco effectively terminated the CBA." Id. "Consequently, the CBA was not 'void,' but merely 'voidable,' and therefore, Bla–Delco's purported termination of the CBA is not a legitimate defense to the Trust Funds' action." Id.; see also, Int'l Brotherhood of Elec. Workers Local Union No. 380 v. State Elec., Case No. 04-2610, 2006 WL 2228863, at *4 (E.D. Pa. Aug. 3, 2006) ("so long as there is a dispute between State and Local 380 over whether the Agreement was terminated, State is barred from raising termination as a defense against the Fund"); Central States, Southeast and Southwest Areas Pension Fund v. Kabbes Trucking Co., Case No. 02 C 1809, 2004 WL 2644515, at *18 (N.D. Ill. Nov. 18, 2004) ("The Defendants' termination defense is only available if the termination of the agreement is incontestable from the face of the agreement. Where, as here, the contract is either unclear or termination is disputed, § 515 of ERISA bars consideration of the contract termination defense.").

However, the fact Bla-Delco could not assert a termination defense did not mean that Bla-Delco's obligation to make contributions would continue indefinitely. As the court explained in a later case, "[w]here there are grievance and arbitration procedures under the CBA, as in <u>Bla-Delco</u>, the obligation to make contributions to the ERISA plans continues until those procedures are followed and the CBA is ruled to be terminated by the appropriate authority." <u>MacKillop v. Lowe's Market, Inc.</u>, 58 F.3d 1441, 1446 (9th Cir. 1995). But, "[a]s a general proposition ... unilateral action of an employer will not render a CBA void and unenforceable[.]" <u>Id.</u> For example, in <u>MacKillop</u>, Lowe's stopped making contributions to the plaintiff trust funds as soon as one of its employees brought an unfair labor practices complaint before the NLRB, in which the employee argued that the CBAs were not valid because employees had been coerced into joining the union. <u>Id.</u> at 1442. The court determined that "Lowe's obligation to make Plan contributions remained regardless of the validity of the CBAs, up to the date of the NLRB's decision regarding such validity." <u>Id.</u> at 1446.

Plaintiff argues that here, similarly to <u>Bla-Delco</u>, defendant has not presented any evidence that the grievance and arbitration provisions of Article VII of the CBA were followed. Plaintiff also contends that defendant has not presented any evidence that the NLRB has determined that the CBA was no longer in force and effect after August 31, 2009.

Thus, plaintiff argues that defendant cannot assert a termination defense in order to escape its liability for contributions after August 31, 2009.

Plaintiff's reliance on <u>Bla-Delco</u> and similar cases is misplaced because here there is no question as to when the CBA expired. As discussed above, all of the evidence in this case indicates that the CBA expired on August 31, 2009.

But even if the CBA expired on August 31, 2009, which it did, plaintiff argues that defendant still had a contractual obligation to make contributions after that date. An employer may be bound by the terms of CBA, even an expired CBA, if it "embark[s] on a course of conduct evincing an intention to be bound." <u>Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.</u>, 823 F.2d 289, 295 n.8 (9th Cir. 1987). "[T]he adoption by conduct theory is based upon the proposition that an employer who complies with the terms of a CBA, even though he has not executed the CBA, may be held to have 'adopted' the CBA by conduct." <u>Shelton v. Hawaii Carpenters' Pension, Health & Welfare, Apprenticeship, Vacation & Holiday and Annuity Trust Funds</u>, 674 F. Supp. 791, 793 (D. Hawaii 1987). One of the most important factors considered in determining whether an employer has adopted a CBA by conduct is "the continuing payment of fringe benefit contributions." <u>Heimerl v. Tech Elec. of Minn., Inc.</u>, --- F. Supp. 2d ---, 2014 WL 1281982, at *20 (D. Minn. 2014). And, an employer need not adopt the CBA in its entirety; rather, "an employer can adopt through its conduct parts o[f] an agreement...." <u>Central States</u>, 2004 WL 2644515, at *21.

Plaintiff argues that after August 31, 2009, the expiration date of the CBA, defendant declared an impasse in October 2009 and implemented some of the provisions of its last offer to the Union. But, defendant did not implement its proposal to replace the health and welfare plan provided by plaintiff with the Aetna plan. Rather, defendant continued to submit remittance reports and make contributions to plaintiff based on the rate provided in the CBA. Plaintiff argues that this conduct proves that defendant continued to be bound by the CBA, or at least creates a genuine issue of material fact as to whether defendant continued to be bound by the CBA.

Defendant contends that its conduct does not prove plaintiff's adoption by conduct theory nor does it create a genuine issue of material fact because it continued to submit reports and make contributions after the CBA expired in order to maintain the status quo as required by the National Labor Relations Act. In other words, defendant contends that it continued to make contributions after August 31, 2009, not because it had a contractual obligation to do so, but because it had a statutory obligation to do so. Under the National Labor Relations Act, "[w]hen a CBA expires without a new agreement having been reached, the employer must continue to bargain in good faith for a new agreement and maintain the status quo during negotiations." Mail Contractors of Amer. v. N.L.R.B., 514 F.3d 27, 31 (C.A.D.C. 2008). "[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment."

Litton Financial Printing Div., a Div. of Litton Business Systems, Inc. v. N.L.R.B., 501 U.S. 190, 198 (1991). One of the mandatory subjects of negotiations is health care benefits. Metropolitan Life Ins. Co. v. Mass., 471 U.S. 724, 733 (1985). Thus, defendant argues that it had to continue to make contributions to plaintiff after the CBA expired in order to maintain the status quo. Defendant contends that it did not cease making contributions to plaintiff until it declared an impasse following the final March 2010 bargaining session. Because there was no conduct on defendant's part after this declaration of an impasse that would suggest that defendant intended to be bound by the terms of the CBA, defendant argues that plaintiff's adoption by conduct theory fails.

Defendant contends that plaintiff is ignoring the fact that there were two declarations of impasse. First, defendant declared an impasse in October 2009 and then unilaterally implemented various proposals. But, defendant contends that the health benefits issue continued to be a matter of negotiation and thus it was required to maintain the status quo as to this issue. Defendant then declared a second impasse in March 2010, after which it implemented the Aetna plan and ceased making contributions to plaintiff.

Defendant may have been maintaining the status quo prior to declaring an impasse in October 2009, but once it declared an impasse it had no further obligation to maintain the status quo. Advanced Lightweight Concrete, 484 U.S. at 544 n.5. ("[i]f the parties were indeed at an impasse, then the employer's statutory duty to maintain the status quo during

postcontract negotiations ... would end"). Defendant is basically arguing that negotiations were not an impasse in October 2009 as to certain issues but were as to others. But, the evidence does not bear this out. The ALJ in the NLRB proceedings found that defendant and the Union were at an impasse in October 2009.[31] One of the issues on which the ALJ found the parties "essentially ... deadlock[ed]" was the replacement of the Taft-Hartley health insurance plan with the company-sponsored plan.[32] The October 6, 2009 letter which Stokes sent to Sawyer declaring an "impasse in these negotiations" listed the health and welfare plan as one of the "key impasse issues."[33] On October 9, 2009, Stokes sent another letter to Sawyer in which he stated that "[t]he negotiations between UNITE-HERE, Local 878 and the Sheraton Anchorage are at an impasse and have been for several weeks. ... The implementation of the Employer's final offer will be announced to the employees at meetings next Monday and Tuesday[.]"[34] Stokes testified at his deposition that "Sheraton declared impasse because on certain issues we and the union were at loggerheads, at total impasse from early

---

[31]Exhibit E at 63, Defendant's Motion and Memorandum for Summary Judgment, Docket No. 39.

[32]Id.

[33]Letter from Arch Stokes to Rick Sawyer at 5, Exhibit 7 to Stokes Deposition, a portion of which is attached to Opposition to Defendant's Motion for Summary Judgment, Docket No. 40.

[34]Letter from Arch Stokes to Rick Sawyer, et. al at 1, Exhibit 8 to Stokes Deposition, a portion of which is attached to Reply in Support of Plaintiff's Motion for Partial Summary Judgment Imposing Liability, Docket No. 44.

in the negotiations. One, was the health and welfare plan. They [the Union] steadfastly took the position that they did not want to agree to some other healthcare provider that we selected or we shopped and compared for[.]"[35] This evidence all suggests that in early October 2009 defendant had declared an impasse as to all issues, including the health and welfare plan issue, and thus it had no obligation to maintain the status quo after that point. The only evidence that might be considered to the contrary is that defendant did not implement its proposal to replace the health insurance plan provided by plaintiff with a company-sponsored plan when it unilaterally implemented other elements of its "final offer" in October 2009. But, there is evidence that suggests that defendant finally implemented the company-sponsored plan because of cost increases, not because the CBA had expired. In a March 2010 letter, Stokes stated that "the reason the Hotel has decided to switch from the union health and welfare plan to AETNA is that an enormous cost increase for the Union health and welfare plan was announced in January...."[36]

When all of the evidence is considered, it suggests that defendant and the Union were at an impasse on all issues, including the health and welfare plan issue, in October 2009. The fact that defendant continued to make contributions to plaintiff after October 2009 indicates

---

[35]Stokes Deposition at 26, lns. 14-21, attached to Reply in Support of Plaintiff's Motion for Partial Summary Judgment Imposing Liability, Docket No. 44.

[36]Exhibit 10 at 2, Stokes Deposition, a portion of which is attached to Opposition to Defendant's Motion for Summary Judgment, Docket No. 40.

that defendant intended to be bound by the terms of the expired CBA. But, once defendant stopped making contributions after April 2010, defendant evinced an intent to no longer be bound by the terms of the expired CBA. Defendant may have evinced an intent to be bound by the terms of the expired CBA prior to May 1, 2010, but there is no evidence that defendant intended to continue to be bound after that date. Because plaintiff is seeking contributions for the time period after May 1, 2010, a time during which there is no evidence that defendant intended to be bound by the terms of the expired CBA, plaintiff's adoption by conduct theory fails.

Plaintiff also argues that defendant is estopped from contending that it had no obligation to make contributions after the CBA expired. In order to prevail on an equitable estoppel theory, plaintiff must show that

> "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."

Gabriel v. Alaska Elec. Pension Fund, --- F.3d ---, 2014 WL 2535469, at *6 (9th Cir. 2014) (quoting Greany v. W. Farm Bureau Life Ins. Co., 973 F.2d 812, 821 (9th Cir. 1992)).

Plaintiff cites to Alaska Trowel Trades Pension Fund v. Lopshire, 103 F.3d 881 (9th Cir. 1996), in support of this argument. There, Lopshire entered into pre-hire agreements with Local 867 of the Operative Plasterers and Cement Masons Union. Id. at 882. The pre-

hire agreements "obligated Lopshire to contribute to the various plaintiff Trust Funds on behalf of all plasterers and cement masons he employed[,]" regardless of union membership. Id.  In April 1986, Lopshire notified the union, but not the plaintiff trust funds, that he was repudiating the current pre-hire agreements.  Id.  However, from April 1986 until March 6, 1991, Lopshire continued to make contributions for union employees, even though he under reported their hours.  Id.  The plaintiff trust funds filed suit against Lopshire to recover contributions for all employees covered by the pre-hire agreements from 1986 until the end of 1992.  Id.  Lopshire counterclaimed to recover all contributions he had made after April 1986.  Id.  Lopshire argued that he had no obligation to make contributions after he repudiated the pre-hire agreements in April 1986.  Id.  The plaintiff trust funds argued that Lopshire was equitably estopped from contending that he had no obligation to make contributions.  Id.  Lopshire "argue[d] that the payments he made to the Trust Funds could not provide a basis for equitable estoppel because they were illegal under § 302(a) of the Labor Management Relations Act (LMRA), which ... forbids payments by an employer to labor organizations or their representatives", unless such payments are made pursuant to a written agreement.  Id.  In short, Lopshire argued "that 'the doctrine of estoppel cannot be invoked to compel ... an illegal act[.]'"  Id. at 883 (quoting Thurber v. W. Conference of Teamsters Pension Plan, 542 F.2d 1106, 1108 (9th Cir. 1976)).  The court rejected this argument because the pre-hire agreements, even though expired, could satisfy the written

agreement requirement.  Id.  The court then considered whether Lopshire was equitably estopped from contending that he had no obligation to make certain contributions after April 1986.  The appellate court held that the district court had not erred in finding that Lopshire was estopped as to the employees for whom he had made contributions.  Id. at 884. The court found that Lopshire had evinced an intent to continue to bound by the pre-hiring agreements "by regularly submitting monthly reports pursuant to the agreement over a five-year period...."  Id.  The appellate court did, however, find that the district court had erred in estopping Lopshire for the period during which he had submitted no reports and made no contributions because "Lopshire made no reports at all upon which the Trust Funds could have relied."  Id.

Plaintiff argues that similarly here defendant should be equitably estopped from contending that it was not required to make contributions for the time in question.  Plaintiff argues that defendant knew the true facts and that defendant, like Lopshire, evinced an intent to be bound by continuing to submit reports and contributions throughout 2009 and into 2010 at the rate provided for in the CBA and according to the deadlines set forth in the Trust Agreement.   Plaintiff also argues that it was "unaware of Sheraton Anchorage's true intention to continue meeting its obligations to the trust for a significant period of time and to then suddenly and unilaterally withdraw."[37]  And, plaintiff argues that it detrimentally

---

[37]Affidavit of Gregg Giles at 4, ¶ 14, Docket No. 38.

relied on defendant's conduct, as evidenced by plaintiff's paying $20,000 in benefits to Sheraton Anchorage employees "for claims submitted prior to May 1, 2010"[38] and "by continuing to provide healthcare coverage to Sheraton Anchorage employees and in making decisions for managing the trust based on Sheraton's continued participation."[39] Plaintiff also contends that defendant's conduct "adversely impacted" its "financial condition and necessary reserves...."[40]

Plaintiff's reliance on Alaska Trowel is misplaced. There, the court held that estoppel was not available for the period during which Lopshire submitted no reports and made no contributions. Similarly here, plaintiff is attempting to claim estoppel for a period of time during which defendant did not make any contributions or submit any reports. Alaska Trowel stands for the proposition that estoppel is available only where it can be shown that a trust fund has relied to its detriment on the conduct asserted. Here, plaintiff contends that it paid more than $20,000 in claims after defendant stopped making contributions. But, because these claims were submitted prior to May 1, 2010, they were claims that plaintiff was obligated to pay because defendant had made contributions prior to May 1, 2010. As for plaintiff's contention that it continued to make trust management decisions based on

_____

[38] Id. at ¶ 13.

[39] Id. at 5, ¶ 15.

[40] Id. at ¶¶ 17-18.

defendant's continued participation, such reliance could not be considered reasonable once defendant stopped making contributions.

These proceedings are about defendant's contractual obligations. The CBA expired by agreement on August 31, 2009. Defendant's conduct extended the obligation to contribute to plaintiff through April 2010, but thereafter, defendant's conduct (stopping reports and contributions) clearly signaled to plaintiff the end of any contract-extending conduct. Plaintiff was not ignorant of defendant's position once defendant stopped making contributions and submitting reports. After defendant stopped making contributions and submitting reports, there was no misleading conduct by defendant on which plaintiff could rely. Thus, plaintiff's estoppel argument fails.

<u>Conclusion</u>

Based on the foregoing, plaintiff's motion for partial summary judgment[41] is denied, and defendant's cross-motion for summary judgment[42] is granted. The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this <u>18th</u> day of August, 2014.

/s/ H. Russel Holland
United States District Judge

---

[41]Docket No. 36.

[42]Docket No. 39.